DETERMINED IN THE

# FIRST DEPARTMENT

AT

## GENERAL TERM,

### December, 1894.

---

EDWARD S. STOKES, Respondent, *v.* JOHN W. MACKAY and Another, Appellants.

*Waiver — of tender of performance — capacity to perform must be shown by the party making the tender — tender need not be kept good — the subject of the tender must be produced on the trial — excuse for its non-production — reversal of a judgment because of its non-production.*

Where a party refuses to perform a contract, and distinctly waives a tender of a performance by the other party to the contract, it is unnecessary for the latter to go through with the form of making a tender in order to entitle him to recover either the purchase price of the thing agreed to be sold by him or damages for the breach of the contract.

A tender of the performance of a contract imports not only readiness and ability by the person making the tender to perform his part of the contract, but the actual production of the thing to be delivered, and while the formal requisite of a tender may be waived, yet, to establish a waiver, there must exist a capacity to perform, and if a person, who has contracted to sell and deliver certain bonds, sells and delivers such bonds to a third person, a waiver of a tender of performance by the party to the first-mentioned contract will not be sufficient to establish a waiver.

If, however, such bonds have been pledged prior to the making of the contract, as collateral for a loan, less in amount than the amount due on account of the purchase price of such bonds as fixed by such contract, it cannot be held as a matter of law that the person pledging the bonds did not have capacity to make good his tender.

The burden rests upon the person offering to make a tender which has been waived to establish his capacity to perform, and his testimony that he was able to obtain the bonds from the pledgees thereof and to deliver them to the vendee is suffi-

cient to authorize a jury to find that he had capacity to perform at the time the tender was waived.

Where the plaintiff in an action brought to enforce a contract was obligated by the terms thereof to deliver to the defendants certain bonds, although the tender thereof be waived, and by reason of such waiver the plaintiff is not bound to prove the making of a formal tender, nor that thereafter he kept the tender good, the defendants upon the trial have the right to insist that the plaintiff should produce such bonds in court as a condition precedent to recovery.

If, however, such bonds have been converted by a third person, and wrongfully taken from the possession of the plaintiff, he cannot be denied the right of recovery because of his inability to produce them. Having offered to the defendants a delivery of the possession of the bonds which they refused to accept, he cannot be made answerable thereafter to the defendants for the consequences resulting wholly from the acts of wrongdoers respecting the same.

In order to obtain the reversal upon appeal of a judgment rendered in favor of the plaintiff in such an action, on the ground that the plaintiff failed to produce such bonds in court upon the trial of such action, the defendants must show that they demanded upon the trial the production of such bonds or the dismissal of the complaint, and must, at least, suggest to the court that they were relying upon the failure of the plaintiff to produce the bonds in court, to secure the direction of a verdict in their favor.

APPEAL by the defendants, John W. Mackay and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 27th day of February, 1894, upon the verdict of a jury, rendered after a trial at the New York Circuit, and also from an order made at the New York Circuit on the 20th day of February, 1894, and entered in said clerk's office denying the defendants' motion for a new trial made upon the minutes.

*Joseph Larocque*, for John W. Mackay, appellant.

*Charles E. Lydecker*, for Hector de Castro, appellant.

*Esek Cowen*, for the respondent.

PARKER, J.:

The merits of this controversy were fully discussed in this court on a former appeal, resulting in a holding that the trial court properly directed a verdict in favor of the plaintiff (19 N. Y. Supp. 918). With this decision the Court of Appeals differed, deciding that there were certain questions of fact which should have been submitted to the jury for their consideration (140 N. Y. 640). On the retrial

these questions of fact were submitted to the jury, resulting in a verdict in favor of the plaintiff.

As the testimony relating to the main features of the controversy was substantially alike on both trials, there would seem to be open for consideration in this court only such questions as are presented by exceptions taken to the rulings of the court in admitting or rejecting evidence, and to exceptions taken to the charge of the court or of refusals to charge as requested. Upon the argument we were strongly impressed with the contention of appellants' counsel in respect to the alleged failure of the plaintiff to make a proper tender of a portion of the bonds, which were the subject of the contract, having a face value of $165,000, coupled with the fact that a portion of such bonds were, at the time of the trial, according to plaintiff's admission, pledged as collateral for certain loans made to him.

Our examination of the subject, however, persuades us that the appellants' position is not well taken; and, notwithstanding the fact that the question seems to have been passed upon on the former appeal, it may not be out of place to briefly state the reasons for our conclusion that the trial court did not err in refusing to direct a verdict upon the grounds assigned by defendants' counsel.

It is not pretended that the plaintiff ever made a formal tender of $115,000 of bonds, which were, at the time of the making of the contract, and for some time thereafter, pledged with the Western National Bank as security for a loan to plaintiff. Of the remaining $50,000 of bonds he did everything by way of delivery that was possible. It appears that these bonds were loaned by the plaintiff to the defendant De Castro prior to the making of the contract, and by him pledged to the Madison Square Bank as collateral to a loan to De Castro, and as he was one of the vendees in the contract, plaintiff, for the purpose of effectuating a delivery of the bonds, gave to him an order upon that bank to deliver to him the bonds when his debt should be paid. As to the $115,000 of bonds there is evidence that plaintiff, in pursuance of instructions given him by his counsel, offered to turn over the bonds, at the same time demanding that the balance of the purchase price, to wit, $75,000, be paid him; that he informed defendant De Castro that he had been instructed to make a formal tender of the bonds, to which

De Castro replied that he would waive the tender; that Mr. Mackay had told him that these bonds belonged to him (Mackay) and repudiated plaintiff's having any interest in them whatever, and that there was no use in his taking the trouble to make a formal tender. According to the testimony of the plaintiff, then, it appears that the defendants not only refused performance of their contract, but, in language as forcible as could be employed for the purpose, attempted to waive anything like a formal tender of the bonds. It is too well settled to admit of further questioning, that where a party refuses to perform and distinctly waives a tender of performance by the other party to the contract, it is unnecessary for the latter to go through with the form of making a tender, in order to entitle him to recover either the purchase price of the thing agreed to be sold or damages for a breach of the contract. (*Baumann* v. *Pinckney*, 118 N. Y. 604; *Lawrence* v. *Miller*, 86 id. 131; *Blewett* v. *Baker*, 58 id. 611; *Nelson* v. *Plimpton F. E. Co.*, 55 id. 480; *Bunge* v. *Koop*, 48 id. 225; *Moses* v. *Bierling*, 31 id. 462; *Cornwell* v. *Haight*, 21 id. 462; *Stone* v. *Sprague*, 20 Barb. 509; *Clarke* v. *Crandall*, 27 id. 73; 3 id. 612.)

This brings us to appellants' further contention, that, assuming what the defendants did amounted to a waiver of a formal tender, still it cannot avail plaintiff unless he was in such a position that he could have made a tender of the bonds.

That a tender imports not only readiness and ability to perform, but actual production of the thing to be delivered, and while the formal requisite of a tender may be waived, to establish a waiver there must exist capacity to perform. (*Eddy* v. *Davis*, 116 N. Y. 247.)

If, in this case, the plaintiff had sold and delivered the bonds to a third party, so that performance on his part was no longer possible, he would be within the rule of *Eddy's* case.

But he had not sold the bonds; instead, he had prior to the making of the contract pledged them as collateral for a loan much less in amount than was due him on account of the purchase price at the time he offered to make tender. All that was needful for him to do in order to obtain possession of the bonds for delivery to the defendants, was to pay the amount of the loan.

Had the defendants been willing to have paid the purchase price as per their contract, and fixed a time and place for making pay-

ment, an arrangement could doubtless have been made to have had a representative of the bank produce the bonds for delivery to the defendants, upon receipt of so much of the purchase price as was due them.

But, assuming appellants' position to be well taken, that it was necessary that the plaintiff should have been in a position to make a formal tender of the bonds at the time of the waiver without reference to the moneys due him from the defendants under the contract, we are of the opinion that it cannot be held, as matter of law, that he did not have capacity to perform. As we have observed, all that it was necessary for him to do to get possession of the bonds, was to pay the sum for which they were pledged as collateral. If he was in a position to do that, or by any other method to obtain possession of the bonds, then he had capacity to perform, and defendants' waiver was effectual.

The affirmative of this proposition doubtless rested with the plaintiff, and he offered in support of it, so far as we have observed, only his own assertion of ability to obtain the bonds from the pledgees and deliver them to the defendants. This was certainly some evidence of the fact, enough at least to have authorized a jury to find that he had capacity to perform at the time the tender was waived.

Appellants insist that the record contains evidence that he was largely indebted at the time of the alleged tender. More than that, they urge that from this evidence it should be found that he was insolvent. While the facts and circumstances brought out on the trial, if considered independently of plaintiff's evidence, might have required a finding of inability to take up the loans, it must be borne in mind that they stand opposed by plaintiff's testimony, and thus was presented a question of fact for the jury, not one of law for the court.

The court, therefore, rightly refused to take that question from them.

It is said that the motion to direct a verdict presents the further point whether, in order to recover, the plaintiff was not bound to produce the bonds upon the trial for delivery to the defendants. If it does present that question we think error was committed. There was such evidence of waiver of tender, as we have already

shown, as would authorize a finding of waiver. In considering the present questions, therefore, it must be assumed that tender was effectually waived. The tender having been waived, there was of course no tender to keep good, and the position taken in that respect is inaccurate. But while the plaintiff, because of the waiver, was not bound to prove the making of a formal tender and that thereafter he had kept the tender good, we do think the defendants upon the trial had the right to insist that the plaintiff should produce $115,000 of the bonds in court as a condition precedent to recovery.

Plaintiff's testimony in relation to the $50,000 of bonds, if accepted, would have excused their non-production in court. He said that those bonds had been converted by a third party. We have not the details of the transaction, but so far as the testimony goes, it is to the effect that they were wrongfully taken from the possession of the plaintiff. If that be true, it would follow that the plaintiff could not be denied the right of recovery because of his inability to produce them. Having offered to defendants a delivery of possession of the bonds, which they refused to accept, he could not be made answerable thereafter to the defendants for consequences resulting wholly from the acts of wrongdoers respecting them.

But as to the $115,000 of bonds which had been pledged by the plaintiff as collateral for loans, we think the defendants had the right to insist upon their production in court, to the end that they should come to the possession of the defendants in the event of a recovery by the plaintiff. The plaintiff was the last witness sworn on the trial, and he told when these bonds were pledged as collateral and the amount of the loans, and asserted that they were ready for the defendants. We quote a portion of his testimony: "I had them on several loans and transferred them, but they are all ready at any time. W. E. D. Stokes has that $50,000 or $30,000 of bonds still; I think he has converted them; that is what I am charging him with, conversion. Q. Then why do you say they are ready for me? A. I might have some difficulty with him, but I can make it all satisfactory to you."

This statement the defendants of course could accept as affording to them sufficient protection in the event of recovery by the plaintiff. They were not bound to accept it, and could have demanded their production in court or that a dismissal of the complaint should

follow. Now, we have read carefully the grounds upon which the defendants based their motion for a direction of a verdict in their favor, and we do not find anything in them which could have suggested, even to the court, that the defendants were relying upon the failure of the plaintiff to produce the bonds in court to secure the direction of a verdict in their favor.

The propositions which the defendants' counsel pressed upon the attention of the court as the grounds for granting their motion were that the plaintiff had never delivered the bonds to the defendants, nor presented an excuse for non-delivery; that he had not made a formal tender of the bonds, nor had the tender been waived, and, if made, it had not been kept good as required by law. We quote the grounds upon which the defendants rested their motion:

"*First.* That the plaintiff had not established the existence of the contract upon which the action was brought.

"*Second.* Upon the ground that there had been no delivery and no tender, and no sufficient evidence of a waiver of a tender, of the $115,000 of United Lines Telegraph bonds, which were shown to have been pledged with the Chemical Bank; that those bonds, as appeared by the evidence, had, to a considerable amount, been subjected by the plaintiff to further and different liabilities, and by the plaintiff's voluntary act passed from his control.

"*Third.* Upon the ground that there had been no delivery and no tender, and no excuse for non-delivery, of the bonds which had been, according to the testimony, in the Madison Square Bank. On the contrary, it appeared from the evidence that after the time, it is alleged, that the contract sued upon was made the plaintiff himself was borrowing money and creating a burden upon those bonds for the payment of his own obligations, and that if any tender had been in point of fact made or proposed the same had not been kept good as required by law."

The point not having been made in the motion for the direction of a verdict, or at any stage of the trial, when, perhaps, it might have been overcome by the payment of the loans and the production of the bonds, it cannot be made available for reversal in this court. If we are right in the views expressed, it follows that the court did not err in denying defendants' request for a direction of a verdict in their favor.

The appellants urge that error was committed by the refusal of the court to receive in evidence a memorandum alleged to have been written by Ingersoll, the stakeholder, as a basis for a telegram to be sent to Mr. Mackay by his representative at the meeting of December 24, 1888, when the preliminary arrangements were being made which ripened into the contract found by the jury to have been entered into.

There were present, as appears by the testimony of the witness Platt, himself, Col. Ingersoll, the defendant De Castro, and the plaintiff Stokes. It was first offered and excluded after defendants' counsel had examined the plaintiff in reference to it with the following result: "Q. (Paper handed witness.) Do you know the handwriting of the paper I now show you? A. Yes, it is signed by Ingersoll; it is his signature and writing. Q. Did you see that paper written? A. I did not; never saw it until to-day, that I remember. Q. Didn't you see Mr. Ingersoll, at the time of that interview, write a paper and hand it to Mr. Platt? A. I have no recollection of any such thing. Q. Did you say you did not? A. I can simply say I have got no recollection of it. Q. That is all you can say? A. That is enough, isn't it?"

The ruling of the court was proper, for, so far as it then appeared, it was a private communication between Col. Ingersoll and Mr. Platt not brought to the attention of any of the parties to this action.

After the defendant De Castro had testified in relation to the circumstances under which the memorandum was written, it was again offered in evidence and excluded by the court.

De Castro testified as follows: "I recall the circumstance of the meeting of the 24th of December, 1888, when Mr. Stokes and Mr. Ingersoll sat around this table in Mr. Stokes' room in the Hoffman House. There was pen, ink and paper on the table at that time. I have said that I had no discussion with Mr. Stokes as to what should be telegraphed to Mr. Mackay. Mr. Ingersoll said that he would prepare a telegram to Mr. Mackay stating what had been done, and wrote it out then and there. The subject of what was to be telegraphed to Mr. Mackay was spoken of then and there. Mr. Ingersoll said he would telegraph to Mr. Mackay; would prepare a telegram to Mr. Mackay. Mr. Ingersoll said he would prepare a

telegram to be sent by Mr. Platt and myself, and sat down and wrote it down then and there; he said he would say in the telegram that the securities had been turned over to him for custody, and that a certain agreement would be sent to Mr. Mackay for his signature, and he wrote a memorandum. (Paper marked Exhibit No. 8 for identification handed witness.) That is the paper which Mr. Ingersoll wrote. We were all sitting at the table there talking together as it was written, and Mr. Ingersoll, I think, read it and talked as he was writing it. I think the whole of what was in that telegram was spoken aloud at that time. The substance of the telegram was spoken in every part."

It will be observed that the witness did not testify that Stokes read the memorandum, or that it was read in his presence. His strongest expression in that direction was: " I think the whole of what was in that telegram was spoken aloud at that time." But what was spoken did not make the memorandum evidence so long as it did not purport to be either a reading of it or a statement of its contents.

What was said was undoubtedly of itself competent evidence, and that the witness was permitted to state. He gave his recollection of what was spoken aloud, and it differed materially from the memorandum, but had it conformed to it the effect would not have been to make the memorandum evidence in the absence of evidence that when spoken it was stated to be the contents of the memorandum.

The memorandum was again excluded by the court after the defendant Mackay's representative, Platt, had testified as follows: " Col. Ingersoll wrote out the text of what he said I was to communicate in a message to be sent to Mr. Mackay. Mr. Stokes was present. Q. Did he write out anything in the presence of these gentlemen? A. Yes, he did. Q. (Paper handed witness.) I show you a paper marked Exhibit 8 for identification, and ask you if that is the paper he then wrote? A. Yes, that is the paper. It was written in the upstairs room of the Hoffman House, at a table in the room. At the time it was written there were at this table Mr. De Castro, Mr. Stokes and I, and it was handed to me in Mr. Stokes' presence."

Platt's evidence added nothing to the force of the evidence already given. He testified that it was written in the presence of Stokes,

FIRST DEPARTMENT, DECEMBER TERM, 1894. [Vol. 82.

but neither he nor any other witness testified to the only fact which would make it competent evidence in view of Stokes' denial of knowledge of it, to wit, that Stokes either read it, heard it read, or knew its contents.

Complaint is made because of the exclusion of certain testimony offered by the defendants touching the value of the poles, wires and physical property generally of the Bankers and Merchants' Company in December, 1888, which went into the United Lines system.

The theory upon which this evidence was offered was, that inasmuch as it is not pretended that the defendant Mackay in terms agreed to be bound by the proposed agreement sent him for consideration, but became chargeable, if at all, as a party because of acts of ratification and adoption on his part, and as upon this subject there was a conflict of testimony, defendants contend that evidence touching the advantages and disadvantages which would result to the defendant Mackay under the contract, would have a bearing on the probabilities of the case.

The view which the trial court apparently took of the proposed evidence as to the value of poles and lines was that it could only result in misleading the jury, because it permitted the same witness to testify in relation to the revenues which came to the Postal Telegraph Company through the United Lines Telegraph Company.

It seems to us that this view was the correct one, for the franchises of a corporation of this character constitute a very important element of value, and whether such a property, including both the franchises and physical property, has small or great value depends upon their earning capacity. The true test is whether they have capacity to pay expenses and earn profits. But if it be assumed that the evidence offered was competent upon the subject of value, we think the judgment should not be reversed for its exclusion, because it could not in any way have affected the result.

The purpose of its offer was, as we have already observed, to enable the jury to infer from the comparatively small value of the property that Mackay's assertion, that he not only did not make the contract, but that he never intended to ratify or adopt it, was truthful.

It can have no material bearing upon what took place prior to the telegram from Mackay to Platt, because it is conceded that at that

time Mackay was entirely ignorant of the price that defendant De Castro had agreed should be paid for the property. As he knew nothing about the price, the question of the value of the property was necessarily not presented to him. It could have had no effect upon his action in writing the letter of January 3, 1889, to Ingersoll, in which he instructed him to hold the bonds and stock then in his possession which he had received from Stokes for Mackay, because he testified that at the time of such writing he had no intention of signing the contract, or paying the consideration mentioned in it. Necessarily, therefore, the value of the property had no bearing upon his actual intent.

The judgment necessarily proceeds upon the theory that as soon as Mackay discovered that by the terms of the contract he was to cancel the C. H. Read Company note and pay to the plaintiff $100,000, that he never really intended to execute the contract or adopt it. But, notwithstanding his secret intent not to become a party to the contract, he did in fact adopt it by acts which led the plaintiff to think otherwise, and to act accordingly, resulting in the possession of the greater part of the securities mentioned in the contract coming to Mackay, who has ever since retained them.

In other words, while he did not intend to make the contract, upon which plaintiff has recovered, he has been held to have intended, not that which he secretly intended, but which the other party to the contract had a right to assume, from his words and acts, was his real intent.

Many other exceptions have been pressed upon our attention, but we do not think they require a reversal of the judgment.

The judgment should be affirmed, with costs.

VAN BRUNT, P. J., and O'BRIEN, J., concurred.

Judgment affirmed, with costs.